# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2022-NMCA-028**

**Filing Date: October 22, 2021**

**Nos. A-1-CA-38910 & A-1-CA-38983**
**(consolidated for the purpose of opinion)**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH & FAMILIES**
**DEPARTMENT,**

       Petitioner-Appellee,

v.

**DOUGLAS B.,**

       Respondent-Appellant,

and

**SARA E.,**

       Respondent,

**IN THE MATTER OF ABIGAIL B.,**

       Child.

and

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH & FAMILIES**
**DEPARTMENT,**

       Petitioner-Appellee,

v.

**SARA E.,**

       Respondent-Appellant,

and

**DOUGLAS B.,**

Respondent,

**IN THE MATTER OF ABIGAIL B.,**

Child.

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**Allen R. Smith, District Judge**

Certiorari Granted, April 19, 2022, No. S-1-SC-39139; Cross-Petition by CYFD Granted, April 19, 2022, No. S-1-SC-39139; Cross-Petition by Sara E. Granted, April 19, 2022, No. S-1-SC-39139. Released for Publication June 21, 2022.

Children, Youth & Families Department
Mary McQueeney, Acting Chief Children's Court Attorney
Robert Retherford, Children's Court Attorney
Santa Fe, NM

for Appellee

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant Douglas B.

Susan C. Baker
El Prado, NM

for Appellant Sara E.

Gail Chasey
Albuquerque, NM

Guardian Ad Litem

## OPINION

**MEDINA, Judge.**

**{1}** This consolidated opinion addresses two separate appeals: *State ex rel. Children, Youth & Families Department v. Douglas B.* and *State ex rel. Children, Youth & Families Department v. Sara E.* Because the appeals stem from the same nexus of facts and raise substantially similar issues involving child abuse and neglect proceedings and the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901 to -1963 (1978, as amended through 2021), we exercise our discretion to consolidate them for decision. *See* Rule 12-317(B) NMRA.

**{2}** Douglas B. (Father) and Sara E. (Mother) (collectively, Parents) appeal the district court's finding that Abigail B. (Child) is an abused and neglected child and the district court's placement of Child in the custody of the Children, Youth and Families Department (CYFD). Parents raise three arguments on appeal. They contend that (1) CYFD did not prove that active efforts were made to preserve the family by clear and convincing evidence; (2) CYFD's proffered qualified expert witness was not qualified; and (3) the expert did not offer the testimony required by ICWA to allow for Child's removal from Parents' custody. Because we agree that the proffered expert was not qualified to testify as to whether Child's continued custody by Parents is likely to result in serious emotional or physical damage to Child, we reverse and remand for a new adjudicatory hearing consistent with this opinion.

**BACKGROUND**

**{3}** On October 16, 2018, CYFD received a referral from a source alleging that Child was abused and neglected by Parents. Child told the source that "she is cutting herself off and on[,] . . . [that] she [was] very depressed . . . [and that] she was going to run away and wanted to kill herself." Child stated that Mother and Father "are constantly fighting with each other" and that "[Father] is an alcoholic." According to Child, these fights "happen[] all of the time" and have, on more than one occasion, involved Parents throwing objects at one another, including wine glasses and a laptop computer.

**{4}** CYFD developed a safety plan to enable Child to stay in Parents' home. However, several of Child's family members expressed concern about "severe domestic violence occurring in the home[.]" Family members also told CYFD that Parents were using methamphetamine and abusing alcohol. "[B]ecause of the safety risks created by the ongoing domestic violence in the home and the concerns of drug use and inadequate shelter," CYFD took custody of Child. Child was temporarily placed with Father's sister, Kimberly B. (Aunt).

**{5}** On October 23, 2018, CYFD filed a petition alleging that Child was abused and neglected by Parents. At the time of its petition, CYFD did not know that Child was an Indian child for purposes of ICWA because Parents "refused to provide information concerning [Child]'s ancestry." During an October 31, 2018 hearing, counsel for CYFD informed the court that because she was only notified of Child's Native American heritage two days before the hearing, an ICWA notice had not yet been mailed to the tribe in which Child might be eligible for membership, the Wichita and Affiliated Tribe of Oklahoma (the Tribe). CYFD sent the Tribe notice of Child's possible tribal affiliation, the Tribe informed CYFD that Child was eligible for membership, and the Tribe intervened in Child's case.

**{6}** Over the course of several hearings, the district court heard testimony from a number of witnesses regarding the allegations of abuse. Aunt—Father's sister and Child's temporary foster parent—testified that she had concerns about Child's safety given the frequent domestic violence in Parents' home. Aunt testified that Father was not sober and that Father had recently told her that he had been using

methamphetamine "for a very long time." Aunt also testified that Parents' home was cluttered, that Child's window had been broken and boarded up, and that she was worried about Child's safety in the event of a fire in the home.

**{7}** Child testified that she did not want to go home because of the fighting between Parents that occurred "once every other day or it would go on all night long." On one occasion, Father broke Child's bedroom door in order to reach Mother who was inside Child's bedroom; as Father came through Child's bedroom door, Mother grabbed Child's laptop and "smashed it over [Father's] head." When asked to describe her mental health, Child replied that she feels "empty," as if she were "in [a] dark hole that never ends." Child acknowledged that she had been cutting her wrists.

**{8}** CYFD permanency planning supervisor Michelle Herrera testified about CYFD's efforts to provide services to the family. Prior to the adjudicatory hearings, Herrera convened a meeting with Parents and their attorneys to discuss CYFD's expectations and processes, including visitation with Child. Although such meetings are not typically arranged, Herrera deemed the meeting necessary as it had become difficult to converse with Parents who frequently engaged in "yelling . . . threats, and arguing." Herrera testified that CYFD attempted to provide (1) psychosocial assessments for Parents to further determine their strengths and opportunities for growth with respect to parenting Child; (2) psychological evaluations; (3) visitation with Child; (4) random drug testing for Parents; (5) substance abuse assessments; (6) mental health assessments for Parents; and (7) domestic violence assessments for Parents. Parents refused to participate in CYFD's recommended services, insisting that they would only participate in services if they were court-ordered. However, when the district court adopted the proposed treatment plan, Parents objected and specifically took issue with the drug testing requirements.

**{9}** Herrera also testified about efforts to communicate with Parents and accommodate visitation. CYFD attempted to schedule visitation on weekdays, but this conflicted with Parents' schedules, so CYFD sought volunteers to accommodate weekend visits for Parents. Parents did not show up for the first scheduled visit and missed the second scheduled visit. Due to Parents' failure to appear, visitation with Child was suspended but resumed six months later upon Mother's request. Parents instructed CYFD to contact them only through their attorneys, so CYFD sent monthly letters and regular emails to Parents' attorneys to provide Parents with information regarding Child, including her academic progress and copies of case plans. Herrera explained that these communications also included offers to schedule service appointments for Parents and encouraged them to reach out to CYFD if they had any questions or concerns.

**{10}** The district court also heard from Kyli Ahtone, an ICWA caseworker employed by Child's Tribe. She testified that she was a member of the Apache Tribe of Oklahoma—a tribe closely related to Child's Tribe. She was familiar with the Tribe's social and cultural expectations with respect to family organization based on her own personal experience. Ahtone also testified that she had significant experience working ICWA cases, had

access to tribal members with whom she could consult for additional knowledge when necessary, had attended numerous trainings on ICWA, and had testified as a qualified expert witness more times than she could remember. The district court accepted Ahtone as a qualified "ICWA expert" witness. Ahtone ultimately opined that CYFD made active efforts to provide remedial services and rehabilitative programs intended to prevent the breakup of the Indian family and that "continued custody by . . . Parents would likely result in serious emotional or physical harm for . . . Child."

**{11}** The district court adjudicated Child as abused and neglected and ordered that Child remain in CYFD custody under the care of Aunt. Father and Mother separately appeal, and we consolidate their appeals for decision.

**DISCUSSION**

**I.      Qualified Expert Witness Under ICWA**

**{12}** The Abuse and Neglect Act (ANA), NMSA 1978, §§ 32A-4-1 to -35 (1993, as amended through 2021), our statutory framework for addressing child abuse and neglect in New Mexico, "represents a continuum of proceedings which begins with the filing of a petition for neglect or abuse and culminates in the termination of parental rights." *State ex rel. Child., Youth & Fams. Dep't v. Maria C.*, 2004-NMCA-083, ¶ 25, 136 N.M. 53, 94 P.3d 796. Between these two fixed points lies the adjudicatory hearing, during which the court determines whether a child has, as CYFD alleges, been abused and neglected. *See State ex rel. Child., Youth & Fams. Dep't v. Melvin C.*, 2015-NMCA-067, ¶¶ 11-15, 350 P.3d 1251 (describing abuse and neglect proceedings under the ANA). Parents argue that CYFD failed to present a qualified expert witness during the adjudicatory hearing and that the district court committed reversible error by allowing Ahtone, CYFD's proffered "ICWA expert[,]" to testify without the necessary foundation. We agree.

**{13}** Before addressing the parties' arguments on the merits, we begin by clarifying the provisions of ICWA relevant to this issue and the applicable standard of review.

**A.      ICWA Sets Forth Two Distinct Requirements Applicable to Qualified Expert Witnesses**

**{14}** Congress enacted ICWA "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families[.]" 25 U.S.C. § 1902. Relevant to the proceedings in this case, ICWA mandates that "[n]o foster care placement may be ordered . . . in the absence of a determination, supported by clear and convincing evidence, *including testimony of qualified expert witnesses*, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e) (emphasis added); *State ex rel. Child., Youth & Fams. Dep't v. Marlene C.*, 2011-NMSC-005, ¶ 30, 149 N.M. 315, 248 P.3d 863 (holding that § 1912(e), as well as § 1912(d), findings

"must be made at the adjudicatory hearing because the adjudicatory hearing is the procedural phase that affords the Indian parent and tribe the most procedural due process protection and best accommodates the requirements of § 1912"). An understanding of ICWA's qualified expert witness requirement is essential to effectuating ICWA's statutory purpose. "Our overarching goal when interpreting ICWA is to effectuate Congress's intent." *Marlene C.*, 2011-NMSC-005, ¶ 15.

**{15}** In discerning legislative intent, "we look first to the plain language of the statute, giving the words their ordinary meaning[.]" *Flores v. Herrera*, 2016-NMSC-033, ¶ 8, 384 P.3d 1070 (internal quotation marks and citation omitted). "[W]hen a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 37, 147 N.M. 583, 227 P.3d 73 (internal quotation marks and citation omitted). Our review here is de novo. *See State ex rel. Child., Youth & Fams. Dep't v. Maisie Y.*, 2021-NMCA-023, ¶ 17, 489 P.3d 964.

**{16}** Because the phrase "qualified expert witness" is not defined by ICWA, we look to the federal regulations implementing ICWA and are further informed by the Bureau of Indian Affairs (BIA) interpretive guidelines. *Cf. Marlene C.*, 2011-NMSC-005, ¶ 18 (considering federally promulgated guidelines when interpreting ambiguities in ICWA). Our Supreme Court has noted, "[I]t is hornbook law that an interpretation of a statute by the agency charged with its administration is to be given substantial weight, and is entitled to judicial deference[.]" *Regents of Univ. of N.M. v. Hughes*, 1992-NMSC-049, ¶ 30, 114 N.M. 304, 838 P.2d 458 (citation omitted) (examining a regulation when interpreting an act and providing that a regulation, which interprets a provision of an act and is promulgated pursuant to statutory authority, "is presumed to be a proper implementation of the provisions of the [a]ct"). In this case, recent regulations promulgated by the United States Department of the Interior, BIA—the executive agency tasked with promulgating rules and regulations to carry out ICWA's provisions— aid our inquiry. *See* 25 U.S.C. § 1952 (requiring and authorizing the Secretary to "promulgate such rules and regulations as may be necessary to carry out the provisions of [this chapter of the ICWA]").

**{17}** These regulations state that a "qualified expert witness *must* be qualified to testify regarding whether the child's continued custody by the parent . . . is likely to result in serious emotional or physical damage to the child and *should* be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe." 25 C.F.R. § 23.122(a) (2016) (emphases added). The definition promulgated by the BIA thus splits the ICWA expert requirement into two separate components: serious damage and cultural standards. The use of the word "must" in the first portion of the definition imposes a mandatory requirement, while the use of the word "should" in the second portion of the definition does not. *See Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 22, 146 N.M. 24, 206 P.3d 135 ("It is widely accepted that when construing statutes, 'shall' indicates that the provision is mandatory[.]"); *In re N.R.*, 836 S.E.2d 799, 812 (W. Va. 2019), (observing that "[t]he [phrase] 'should be' suggests that state courts have discretion to determine whether such testimony is required given

the particular circumstances of the case"), *cert. denied sub nom. Rios v. W. Va. Dep't of Health & Hum. Res.*, 140 S. Ct. 1550 (2020).

**{18}**     Indeed, the BIA clarified that state courts have discretion to determine whether cultural standard testimony is "necessary in any particular case." *See* Indian Child Welfare Act Proceedings, Final Rule, 81 Fed. Reg. 38,778, 38830 (June 14, 2016).[1] In issuing the 2016 Regulations, the BIA explained:

> The final rule does not . . . strictly limit who may serve as a qualified expert witness to only those individuals who have particular Tribal social and cultural knowledge. The Department recognizes that there may be certain circumstances where a qualified expert witness need not have specific knowledge of the prevailing social and cultural standards of the Indian child's Tribe in order to meet the statutory standard. For example, a leading expert on issues regarding sexual abuse of children may not need to know about specific Tribal social and cultural standards in order to testify as a qualified expert witness regarding whether return of a child to a parent who has a history of sexually abusing the child is likely to result in serious emotional or physical damage to the child. Thus, while a qualified expert witness should normally be required to have knowledge of Tribal social and cultural standards, that may not be necessary if such knowledge is plainly irrelevant to the particular circumstances at issue in the proceeding.

*Id.* at 38,829-30 (citation omitted). In accordance with this guidance, we conclude, as have other states, that a qualified expert witness for ICWA purposes *must* be qualified to testify regarding serious damage, but need not necessarily be qualified to testify about cultural standards if such expertise is irrelevant to the particular circumstances at issue in the proceeding. *See, e.g.*, *Eva H. v. Dep't of Health & Soc. Servs.*, 436 P.3d 1050, 1054 (Alaska 2019) ("[T]he ability to testify about the risk of harm is required of every qualified expert witness, but the ability to testify about 'the prevailing social and cultural standards' is not essential in every case."); *Steven H. v. Ariz. Dep't of Econ. Sec.*, 190 P.3d 180, 185 (Ariz. 2008) (concluding that ICWA always requires that an expert be able to testify about harm to the child, but not about tribal customs and childrearing practices); *In re R.L.*, 961 P.2d 606, 609 (Colo. App. 1998) ("[I]f termination is based on parental unfitness unrelated to Indian culture or society, an expert witness . . . need not possess special knowledge of Indian life."); *In re Guardianship of LNP*, 294 P.3d 904, 910-11 (Wyo. 2013) (concluding that a qualified expert witness with substantial education and experience need not have special knowledge of Indian life if testimony does not implicate cultural bias); *In re L.L.*, 2019 UT App. 134, ¶ 19, 454 P.3d 51 (recognizing that "[i]n many ICWA cases, expert testimony *may* be necessary to educate a court about tribal customs and childrearing practices to diminish any risk of cultural bias" (emphasis added) (internal quotation marks and citation omitted)).

---

1The "Final Rule" refers to the 2016 amendments to ICWA. 81 Fed. Reg. 38,778, 38,779.

**B.  The Standard of Review Applicable to a District Court's Acceptance of Qualified Expert Witnesses Under ICWA Is Abuse of Discretion**

**{19}**   Before we address whether the district court erred in accepting Ahtone as a qualified expert witness, we must first determine the standard of review applicable to this inquiry. Parents argue that our consideration of the qualifications of proffered expert witnesses should be de novo. In contrast, CYFD argues that an abuse of discretion standard should be adopted.

**{20}**   The standard of review to be applied to a district court's decision to qualify and admit the testimony of a qualified expert witnesses within the meaning of 25 U.S.C. § 1912(f) appears to be a matter of first impression in New Mexico. Father directs us to *In re L.L.*, 454 P.3d 51, to support his argument that the admission of an individual as a qualified expert witness under ICWA should be reviewed under a de novo standard. In *In re L.L.*, the Utah Court of Appeals reviewed an appeal by a guardian ad litem challenging the district court's denial of its motion to transfer the custody of an Indian child from her mother to the state's family services department. *Id.* ¶ 1. On appeal, the guardian ad litem argued that the district court erred when it deferred to the interpretation of the qualified expert witness requirement in the regulations and in doing so, precluded the guardian ad litem's proffered witnesses from being admitted as qualified expert witnesses. *Id.* ¶¶ 5, 7. Contrary to Father's characterization however, the Utah Court of Appeals did not review the district court's rejection of the guardian ad litem's proffered expert witnesses under a de novo standard. Rather, the court reviewed de novo the district court's *interpretation of and deference to the qualified expert witness definition included in BIA regulations. Id.* ¶ 8. Upon concluding that no error occurred in this respect, the court then determined that the district court's application of the qualified expert witness definition to the facts at hand was in excess of its *discretion. Id.* ¶¶ 8, 20-23. Father's reliance on *In re L.L.* is thus misplaced.

**{21}**   Similarly, Mother argues for de novo review of the admission of a qualified expert witness, citing *Marcia V. v. Alaska*, 201 P.3d 496 (Alaska 2009), but her argument misconstrues the case. In *Marcia V.*, the Alaska Supreme Court noted that "[t]he question of whether an expert's testimony presented at trial is sufficient pursuant to ICWA is a legal question, which we review de novo." *Id.* at 502. However, the court did not—as Mother seems to claim—review the *admission* of the qualified expert witnesses de novo, but instead applied an abuse of discretion standard to that question. *See id.* at 505 ("[W]e conclude that the court did not abuse its discretion in qualifying [a state children's services supervisor] as an expert[.]").

**{22}**   Unpersuaded by Parents' arguments, we turn again to the same 2016 regulations for a different purpose: to determine whether they offer any guidance as to the applicable standard. The 2016 regulations explain that

>   [a] qualified expert witness must be *qualified* to testify regarding whether the child's continued custody by the parent . . . is likely to result in serious emotional or physical damage to the child and should be *qualified* to testify

as to the prevailing social and cultural standards of the Indian child's Tribe. A person may be designated by the Indian child's Tribe as being qualified to testify to the prevailing social and cultural standards of the Indian child's Tribe.

25 C.F.R. § 23.122(a) (emphases added). The requirement that an expert be "qualified" implies that ICWA experts are to be evaluated in the same manner as other experts under a given jurisdiction's evidentiary rules. *See, e.g.*, Rule 11-702 NMRA ("A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."); *see also State v. Alberico*, 1993-NMSC-047, ¶ 43, 116 N.M. 156, 861 P.2d 192 (noting that the first prerequisite for admission of expert testimony "is that the expert be qualified").

**{23}**　　We see no reason to apply a different appellate review framework from the abuse of discretion standard that we generally apply in New Mexico to evaluate the admission of expert testimony. *See Id.* ¶ 58 ("The rule in this [s]tate has consistently been that the admission of expert testimony . . . is peculiarly within the sound discretion of the trial court and will not be reversed absent a showing of abuse of that discretion."). We have routinely applied the abuse of discretion standard when evaluating whether an individual is qualified to testify as an expert witness across all other contexts where the admission of expert witness testimony is at issue. *Id.*; *see also State v. Sloan*, 2019-NMSC-019, ¶ 42, 453 P.3d 401 ("Appellate courts review the qualification of an expert for an abuse of discretion."); *Lopez v. Reddy*, 2005-NMCA-054, ¶ 14, 137 N.M. 554, 113 P.3d 377 ("In determining whether an expert witness is competent or qualified to testify, the district court has wide discretion, and the court's determination of this question will not be disturbed on appeal, unless there has been an abuse of this discretion." (alteration, omission, internal quotation marks, and citation omitted)). Not only is this conclusion supported by our own jurisprudence, it is also supported by decisions from other jurisdictions addressing this issue in the context of ICWA, including those cases cited by Parents. *See, e.g.*, *In re L.L.*, 2019 UT App. 134, ¶ 8 (applying abuse of discretion to admission of expert witness in a case subject to ICWA); *Marcia V.*, 201 P.3d at 501 (same); *Monroe Cnty. Dep't of Hum. Servs. v. Luis R.*, 2009 WI App 109, ¶ 33, 320 Wis. 2d 652, 770 N.W.2d 795 (same); *In re LNP*, 2013 WY 20, ¶ 17, 294 P.3d 904 (same); *In re D.M.*, 2003 SD 49, ¶ 19, 661 N.W.2d 768, 773 (same); *In re T.W.F.*, 2009 MT 207, ¶ 17, 351 Mont. 233, 210 P.3d 174 (same); *Busenbark v. Oklahoma*, 2005 OK CIV APP 5, ¶ 17, 105 P.3d 354, 359 (same). We note that to the extent our analysis of this issue involves the interpretation of ICWA and other questions of law, our review is de novo. *See Maisie Y.*, 2021-NMCA-023, ¶ 17.

## C.　　Whether Ahtone Was Qualified to Testify as the Qualified Expert Witness

**{24}**　　Having determined the appropriate standard of review, we now evaluate whether the district court abused its discretion in allowing Ahtone to testify as the ICWA qualified expert witness in this case. "In determining whether an expert witness is competent or

qualified to testify, the [district] court has wide discretion, and the court's determination of this question will not be disturbed on appeal, unless there has been an abuse of this discretion." *Lopez*, 2005-NMCA-054, ¶ 14 (alteration, omission, internal quotation marks, and citation omitted). "The ruling will not be disturbed unless it is manifestly wrong or the trial court has applied wrong legal standards in the determination." *Id.* (alterations, omission, internal quotation marks, and citation omitted).

{25}    We reiterate that ICWA's qualified expert witness requirement has two components: (1) a "qualified expert witness *must* be qualified to testify regarding whether the child's continued custody by the parent . . . is likely to result in serious emotional or physical damage to the child," and (2) the witness "*should* be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe." 25 C.F.R. § 23.122(a) (emphases added). We address the cultural standards requirement first because both the parties and the district court focused primarily on this requirement during proceedings below.

1.    **Ahtone Was Qualified to Testify With Respect to the Prevailing Social and Cultural Standards of Child's Tribe**[2]

{26}    In his reply brief, Father argues that the recommendation or designation of a qualified expert witness by a tribe or the BIA should not be entitled to deference. This, however, is contrary to the BIA guidelines, which provide that "[a] qualified expert witness should have specific knowledge of the Indian tribe's culture and customs[,]" and then sets out a list of persons who, "in descending order [based on various levels of experience and knowledge], are presumed to meet the requirements for a qualified expert witness[,]" including "[a] member of another tribe who is recognized to be a qualified expert witness by the Indian child's tribe based on their knowledge of the delivery of child and family services to Indians and the Indian child's tribe." Guidelines for State Courts & Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146, 10,157, § D.4 (Feb. 25, 2015).[3]

{27}    Regardless, Ahtone demonstrated that she was in fact qualified to testify as to the prevailing social and cultural standards of the Child's Tribe by testifying to her experience and knowledge. *See* Rule 11-702 ("A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if the expert's scientific, technical or other specialized knowledge will help the trier of fact understand the evidence or to determine a fact in issue."); *see also* 171 Am. Jur. 3d *Proof of Facts* 293, § 39 (2018) ("In child custody proceedings subject to the ICWA, the trial court is required to determine the proper foundation to qualify a witness as an expert witness."). She testified that she was a member of the Apache Tribe of Oklahoma—a tribe closely related to the Tribe. Ahtone grew up on her

---

[2]Neither party addresses whether an expert in prevailing social and cultural standards of Child's Tribe was necessary under the circumstances of this case. We, therefore, do not address this matter.
[3]While we acknowledge that only the regulations and not the guidelines are binding, "[w]e have previously found [BIA] guidelines persuasive[.]" *In re Guardianship of Ashley Elizabeth R.*, 1993-NMCA-129, ¶ 8, 116 N.M. 416, 863 P.2d 451.

tribe's reservation and was also raising her own children in her cultural traditions. She was familiar with the Tribe's social and cultural expectations with respect to family organization based on her own personal experience, and also had access to tribal members with whom she could consult for additional knowledge when necessary. Ahtone also testified that she had significant experience working ICWA cases, had attended numerous trainings on ICWA, and had testified as a qualified expert witness more times than she could remember.

**{28}** Despite Ahtone's apparent qualifications, Father argues that Ahtone could not serve as a qualified expert witness because she is not a member of Child's Tribe. We disagree. BIA guidelines explicitly state that "[t]here is no requirement that the qualified expert witness be a citizen of the child's Tribe." U.S. Dep't of the Interior, Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act, 55 (2016). Taking this one step further, the guidelines explain that "[i]n some instances, it may be appropriate to accept an expert with knowledge of the customs and standards of closely related Tribes." *Id.*

**{29}** Such is the case here. Ahtone, a member of the Apache Tribe of Oklahoma, testified at the adjudicatory hearing that she was familiar with the cultural and social standards of the Tribe and that she was unaware of any significant different tribal standards between her tribe and Child's. Through her employment with the Tribe, Ahtone had attended more ceremonies with the Tribe than with her own tribe. Moreover, Ahtone explained that she had access to members of the Tribe with whom she could consult when she has specific questions about the Tribe's cultural and social standards. Given the foregoing, we conclude that the district court did not abuse its discretion in accepting her testimony as to the applicable prevailing social and cultural standards.

**2. Ahtone Was Not Qualified to Opine as to Whether Child's Continued Custody by Parents Was Likely to Result in Serious Emotional or Physical Damage to Child**

**{30}** We now consider whether Ahtone was "qualified to testify regarding whether the child's continued custody by the parent . . . is likely to result in serious emotional or physical damage to the child." 25 C.F.R. § 23.122(a). Based upon the record before us, we conclude that CYFD did not lay a sufficient foundation to establish that Ahtone had the requisite "knowledge, skill, experience, training or education," *see* Rule 11-702, to form an opinion on this subject.

**{31}** Subsections (c) and (d) of 25 C.F.R. § 23.121 (2016) illuminate the evidentiary standard a proffered ICWA expert testifying about potential emotional or physical damage to the child must meet:

> (c) For a foster-care placement or termination of parental rights, the evidence must show a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage to the child[.]

(d) Without a causal relationship identified in paragraph (c) . . . evidence that shows only the existence of community or family poverty, isolation, single parenthood, custodian age, crowded or inadequate housing, substance abuse, or nonconforming social behavior does not by itself constitute clear and convincing evidence or evidence beyond a reasonable doubt that continued custody is likely to result in serious emotional or physical damage to the child.

BIA guidelines further explain that an expert witness who is qualified to draw this causal connection must have an "expertise beyond normal social worker qualifications." U.S. Dep't of the Interior, BIA, Guidelines for Implementing the Indian Child Welfare Act, 53-54. We join the numerous courts in other jurisdictions that have interpreted this language as requiring ICWA experts to have expertise beyond the "normal" social worker qualifications. *See Luis R.*, 2009 WI App 109, ¶ 38 (holding that social worker's specialized knowledge as result of bachelor's and master's degrees in criminal justice did not qualify the social worker to testify regarding the likelihood of serious damage to the child from continued custody by the parent, and experience in monitoring conditions imposed on parents for the return of their children did not suggest something beyond normal social work qualifications); *Eva H.*, 436 P.3d at 1056 (holding that the proposed expert witness's extensive experience as a guardian ad litem did not meet the heightened standard for qualified expert witnesses under ICWA); *In re M.F.*, 225 P.3d 1177, 1185 (Kan. 2010) (holding that social workers testifying in a proceeding subject to ICWA must have substantial education and experience in the area of social work beyond the typical qualifications for the profession and citing other jurisdictions that have reached the same conclusion); *C.E.H. v. L.M.W.*, 837 S.W.2d 947, 955 (Mo. Ct. App. 1992) (stating that the phrase "qualified expert witness" is not defined by ICWA, but legislative history of ICWA reveals that phrase is meant to apply to expertise beyond normal social worker's qualifications).

**{32}**   Father argues that there was "no indication whether Ahtone's training and experience equipped her to address 'serious emotional or physical damage to [C]hild' at any level." We agree that the record does not contain a sufficient foundation establishing that Ahtone was qualified to render an expert opinion on this subject. Under Rule 11-702, "a witness must qualify as an expert in the field for which his or her testimony is offered before such testimony is admissible. In most cases, this means that the calling party must qualify the witness to testify as an expert first, before any substantive testimony is given." *Lopez*, 2005-NMCA-054, ¶ 15 (internal quotation marks and citations omitted). This case involved allegations of substance abuse, domestic violence, self-harm, suicidal ideation, and household hazards, and Ahtone did not demonstrate that she had the requisite expertise in these areas to opine as to "a causal relationship between [these] particular conditions . . . and the likelihood that continued custody of [C]hild will result in serious emotional or physical damage to [Child]." 25 C.F.R. § 23.121(c).

**{33}**   Ahtone did testify that she holds a bachelor's degree in criminal justice, significant experience working ICWA cases over her five-year tenure as an ICWA

caseworker, had attended numerous trainings on ICWA, and had been qualified as an ICWA expert witness at least fifty times. She also said she was familiar with how tribal family disputes are generally resolved based on personal experience growing up in a similar tribal culture. Finally, she testified that alcohol and drug abuse is not typically tolerated within tribal cultures. However, Ahtone did not claim to have any education, training, or specialized knowledge that would permit her to testify about "a causal relationship between the particular conditions in the home and the likelihood that continued custody of [C]hild will result in serious emotional or physical damage to [Child.]" 25 C.F.R. § 23.121(c). Numerous other courts have concluded that proffered experts with similar levels of training and experience do not meet ICWA's heightened requirement for expert testimony. *See, e.g.*, *Eva H.*, 436 P.3d at 1057 (holding that a guardian ad litem experienced in cases involving substance abuse, domestic violence, and delivery of child to protective services did not meet the heightened standard for a qualified expert witnesses under ICWA because the proffered expert had no formal training in social work, psychology, or counseling, and she had no professional tools for recognizing mental health issues); *Oliver N. v. Dep't of Health & Soc. Servs.*, 444 P.3d 171, 177-79 (Alaska 2019) (holding that a tribal elder offered as an expert at a termination of parental rights trial, while clearly qualified to testify to tribal cultural standards and childrearing norms, was unqualified to speak to the likelihood of harm to the child if returned to the parent's custody because there was no evidence that the source of the tribal elder's conclusion that the father's behavior would likely harm the child was based on anything other than the elder's extensive life experience as a community leader and grandfather, which was insufficient to qualify him to testify about the likelihood of harm should the child be returned to the father); *Luis R.*, 2009 WI App 109, ¶ 38 (holding that a social worker's specialized knowledge as a result of bachelor's and master's degrees in criminal justice did not relate to required showing of likely serious damage to the child from continued custody by the parent, and experience in monitoring conditions imposed on the parents for the return of their children did not suggest something beyond normal social work qualifications); *In re Adoption of H.M.O.*, 1998 MT 175, ¶ 34, 289 Mont. 509, 962 P.2d 1191 (holding that the district court abused its discretion in qualifying an ICWA expert where the record was silent as to the qualifications beyond being a social worker).

{34}    Similarly here, we are not satisfied that CYFD laid a sufficient foundation to qualify Ahtone as an expert witness qualified to opine as to the likelihood of future emotional or physical damage to Child. We acknowledge that "no set criteria can be laid down to test [the] qualifications" of an expert, *Smith v. Smith*, 1992-NMCA-080, ¶ 19, 114 N.M. 276, 837 P.2d 869, and we do not mean to say that a social worker may never be qualified as an expert witness for ICWA purposes.[4] Nonetheless, we do not believe that Ahtone adequately demonstrated that she had the requisite knowledge, education, or training, to qualify as an expert on this issue. She did not explain whether or how her bachelor's degree in criminal justice supported her purported expertise, did not explain the specifics of her ICWA training, or indicate whether or how her ICWA training provided her with relevant knowledge, and when asked about family disputes and

---

[4]We recognize "[t]he social worker regularly assigned to the Indian child may not serve as a qualified expert witness in child-custody proceedings." 25 C.F.R. § 23.122(c).

substance abuse, testified that her understanding of such matters was limited to her personal experiences growing up.

**{35}**     Under an abuse of discretion standard, a district court's qualification of an expert "will not be disturbed, unless it is manifestly wrong or the [district] court has applied wrong legal standards in the determination." *Lopez*, 2005-NMCA-054, ¶ 14 (alterations, omission, internal quotation marks, and citation omitted). In this case, the district court did not appear to draw a distinction between Ahtone's qualifications to opine on social and cultural standards and the separate requirement that she be qualified to opine on emotional or physical damage to Child. Instead, the district court ultimately qualified her under the general term "ICWA expert." In failing to separate these two bases, the district court applied the wrong legal standard, and there is insufficient foundational evidence in the record to uphold the district court's acceptance of Ahtone as qualified to issue an opinion as to whether Child's continued custody by Parents was likely to result in serious emotional or physical damage. In absence of testimony from a qualified expert, we conclude that the district court's finding required under § 1912(e) must be reversed as well as the neglect and abuse adjudications. *See Marlene C.*, 2011-NMSC-005, ¶ 47 (reversing neglect adjudication "because the findings required by § 1912 (d) and (e) of ICWA were not made at the adjudicatory hearing on abuse and neglect").[5]

## II.     The Remedy on Remand

**{36}**     In his brief in chief, Father's requests that we reverse and remand with instructions to implement a plan for reunification and in his reply brief requests that we reverse and remand for a new trial. Mother on the other hand seeks reversal of the adjudication order, return of Child to Mother, and alternatively a new custody and adjudicatory hearing "to ensure proof that Mother received 'active efforts' prior to the removal of Child" and at which CYFD presents testimony from a qualified ICWA expert. CYFD requests affirmance of the district court's adjudicatory order in both Father and Mother's cases.

**{37}**     In this case as a matter of first impression we clarify that ICWA sets forth two distinct requirements for qualified expert witnesses, and we reverse the neglect and abuse adjudications upon a determination that the record did not support the district court's qualification of Ahtone to testify as an expert regarding the risk of harm to Child. We recognize that if we were to order dismissal of the abuse and neglect petition, CYFD would be "precluded from bringing the same potentially meritorious allegations in a new petition but would instead have to decide whether it had grounds to supplement the original petition or file a new petition with different allegations of abuse or neglect." *Marlene C.*, 2011-NMSC-005, ¶ 49. We conclude, just as our Supreme Court concluded in *Marlene C.*, that "requiring CYFD to begin the process anew in this case by bringing new allegations of abuse [and] neglect neither promotes judicial economy nor protects

---

[5]Because we conclude that the district court abused its discretion in qualifying Ahtone as an expert capable of offering a risk of harm opinion and reverse on that ground, we need not address Parents' separate challenge to the sufficiency of her testimony, nor do we reach Parents' remaining arguments on appeal.

Child's best interests." *Id.* Therefore we remand this case to the district court for a new adjudicatory hearing.

**CONCLUSION**

**{38}** For the foregoing reasons, we reverse and remand for further proceedings in accordance with this opinion.

**{39} IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**JENNIFER L. ATTREP, Judge**

**MEGAN P. DUFFY, Judge**